## THE NIAGARA.

### (District Court, W. D. New York. June 1, 1923.)

### No. 1215.

1. **Shipping ⬤═106—Order notify bill of lading held maritime contract of carriage.**

Where the master of a vessel executed an order notify bill of lading presented by shipper, who·explained that the production of the bill of lading would be necessary before the cargo could be released, *held*, that he acted within the scope of his authority, and the agreement was binding on the ship as a maritime contract to safely transport and deliver the cargo, subject to a maritime lien for carrying charges, and gave both shipper and ship rights and remedies in rem.

2. **Shipping ⬤═132(1)—Transferee of bill of lading may sue in rem for breach of contract of carriage.**

Under Canadian law as well as that of the United States, the unqualified transfer of a bill of lading to order notify vests transferee with a right of action in rem against the vessel for breach of contract by making delivery to the party to be notified without production of the bill of lading, and under Act Cong. Aug. 29, 1916, §§ 30, 31, 34, 38 (Comp. St. §§ 8604oo, 8604p, 8604qq, 8604ss), it was immaterial that the bill of lading was given to secure a loan, since by indorsement of the bill of lading transferee became owner of the goods, and was not required to sue in conversion.

In Admiralty. Suit on contract of affreightment by the Molsons Bank against the steamer Niagara, her tackle, etc., claimed by the Rochester Steamship Company. Decree for libelant.

Decree affirmed 297 Fed. 670. See, also, 284 Fed. 971.

Locke, Babcock, Spratt & Hollister, of Buffalo, N. Y. (Evan Hollister, of Buffalo, N. Y., of counsel), for libelant.

Brown, Ely & Richards, of Buffalo, N. Y. (John B. Richards and David S. Jackson, both of Buffalo, N. Y., and James H. McGillan, of Green Bay, Wis., of counsel), for respondent.

HAZEL, District Judge. [1] The master of the steamer Niagara, in July, 1921, acted within the scope of his authority when the original bill of lading covering the pulpwood in question was executed by him on its presentation by the shipper, the Russell Timber Company. Its wording showed him that it was drawn to libelant's order, and included instructions to notify the Riverside Fiber Company (upon whom the two drafts were drawn) before making delivery of the pulpwood at Appleton, Canada. It was explained to him orally by the witness Russell (president of the Russell Timber Company) that the original bill

---

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of lading would be necessary before he could release the cargo. It is, however, urged that all the bills of lading for pulpwood were a novelty to the master, since shipments were customarily on general account, and that ordinarily title of the cargo passed to the purchaser which was constructively considered delivered to the consignee upon loading aboard the steamship. The shipment with which we are concerned, however, was a special arrangement in the sense that the Riverside Company had knowledge that the drafts were hypothecated to libelant and the goods could not be delivered until they were paid. Notice was also given the master of the hypothecation of the drafts to libelant, and that deliveries should not be made until the original bill of lading with drafts attached was surrendered to him. The arrangement in my opinion was a maritime contract of carriage, and the bill of lading sufficiently showed the receipt aboard the vessel of the pulpwood at the port of loading together with place of delivery and conditions. Such a contract carries with it the obligation on the part of the ship to safely transport the cargo to its destination and rightly deliver it in the specified manner. It was subject to maritime lien for the carrying charges, and, under the doctrine of The Belfast, 7 Wall. 624, 19 L. Ed. 266, both the shipper and the ship possessed rights and remedies enforceable in rem. The Maggie Hammond, 9 Wall. 435, 19 L. Ed. 772.

[2] The contract with the master for carriage was one made in the ordinary course of his employment, and the principal is barred from repudiating his authority to libelant's prejudice. Bank of Batavia v. N. Y. L. E. R. R., 106 N. Y. 195, 12 N. E. 433, 60 Am. Rep. 440. The letters and telegrams in evidence passing between Wolvin and Boland, relating to the charter of the ship, do not in my opinion disclose any limitations on the master, and hence no material importance is attached to them. The evidence preponderatingly shows that the Molsons Bank in good faith, for value, became the holder of the order bill of lading for the pulpwood in controversy. Its delivery by the master to the Riverside Company, the notify party, without surrender to him of the original bill of lading, resulted in a loss to libelant of the cargo or its equivalent. The sight drafts amounted to $12,840 and $7,704, respectively, attached to the original bill of lading and assignment in evidence, and were not paid. I find that libelant discounted the first draft by decreasing the indebtedness of the drawer, while the second draft was put to the credit of the drawer, and there were overdrafts to cover the amount. There was evidence of the market value of the pulpwood at $16 per cord, or a total of $20,544, representing 1,284 cords, at the time of the transportation and delivery to the Riverside Company at Appleton, Canada. I am unable to sustain claimant's contention that the bill of lading simply created a special property right in the pulpwood in the nature of a pledge or that the transfer was conditional or qualified. Under the terms of the Canadian Bills of Lading Act quoted in my former opinion, 284 Fed. 972, the transaction became a contract of affreightment. It is not materially different from the law of this country. The steamship company, in my opinion, by virtue of the maritime contract, was required to deliver the pulpwood in the manner mentioned in the bill of lading—an order bill of lading—and

for failure to do so an action in rem lies. The Queen of the Pacific (D. C.) 61 Fed. 213.

Respondent's contention that when the bill of lading was signed title to the merchandise passed to the Riverside Company, subject only to the lien of the Molsons Bank amounting to $5,000, an amount for which the Russell Timber Company, Limited, had given its note, is not maintainable. It makes no difference whether the order bill of lading was given as security for an existing loan or owing to the discounting by libelant for value of notes or drafts attached thereto, for under the United States statutes the title became fixed, and in pursuance thereof libelant had the ·same rights of enforcement as if the transaction had actually been entered into between it and the carrier. See Act of Congress August 29, 1916, §§ 30, 31, 34, 38 (Comp. St. §§ 8604*oo*, 8604p, 8604qq, 8604ss). Under these provisions relating to bills of lading under interstate and foreign commerce the order bill of lading carried with it certain implied warranties, in the absence of a contrary intention, including possession and title in the transported merchandise and of any right of action arising thereunder in the same manner as though the Riverside Company had expressly assented to the assignment of the bill of lading to libelant. In this view, much of the testimony emphasized by respondent to the effect that the title to the cargo actually or constructively passed to the Riverside Company upon loading, subject only to any lien libelant may have, is not of material importance. It is true that bills of lading ordinarily are nonnegotiable and are commonly accepted as security for loans and discounts, yet they also carry with them either special or general ownership. Eaton & Gilbert on Commercial Paper; Bank of Batavia v. N. Y. L. E. & W., 106 N. Y. 195, 12 N. E. 433, 60 Am. Rep. 440. This principle finds support in many federal adjudications and in the Canadian act heretofore quoted. That the Molsons Bank, by indorsement of the bill of lading, became the owner of the pulpwood, and that by reason of the arrangement of carriage with the ship it was deliverable only to its order, is decided, I conceive, not only in The Thames, 14 Wall. 98, 20 L. Ed. 804, but in the later case of The Idaho, 93 U. S. 575, 23 L. Ed. 978, cited by respondent to sustain another point. It was said that—

"A delivery of goods to a ship corresponding in substance with a bill of lading given previously, if intended and received to meet the bill of lading, makes the bill operative from the time of such delivery. At that instant it becomes evidence of the ownership of the goods."

The showing therefore, as heretofore indicated, that libelant sustained no loss on the promissory note for which it is claimed the pulpwood was hypothecated, is immaterial. Nor was libelant required to proceed against the steamship for conversion with a view of establishing the value of the pulpwood less freight and other charges. Under the proofs it is enough that, as a result of the improper delivery of the cargo by the steamship under the contract of affreightment, and in violation of the terms of the bill of lading held by libelant for value, and to which sight drafts were attached, damage was sustained by it in the amount of $20,544. As to the nonpayment of the sight drafts, the witness Garre, manager of the Molsons Bank, testified that the sum

of $20,544 represents the value of the pulpwood at $16 per cord, and that the two drafts, one of which was discounted by the bank, and the other taken by assignment, have not been paid, and there has been no recovery thereon. Hence a decree in favor of libelant in the amount stated, with interest and costs, may be entered.